**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on January 8, 2016**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | |
| **ARASH SEPEHRI,** | : | **18 U.S.C. § 371** |
| aka "William Anderson," and | : | **(Conspiracy)** |
| | : | |
| **TAJHIZ SANAT SHAYAN,** | : | **22 U.S.C. § 2778** |
| aka Tajhiz Sanat Company, | : | **(Arms Export Control Act)** |
| | : | |
| | : | **50 U.S.C. § 1705** |
| | : | **(International Emergency** |
| **Defendants.** | : | **Economic Powers Act Violation)** |
| | : | |
| | : | **50 U.S.C. §§ 4601-4620** |
| | : | **(Export Administration Act)** |
| | : | |
| | : | **15 C.F.R. Parts 730-774** |
| | : | **(Export Administration** |
| | : | **Regulations)** |
| | : | |
| | : | **22 C.F.R. Parts 120-130** |
| | : | **(International Traffic in Arms** |
| | : | **Regulations)** |
| | : | |
| | : | **31 C.F.R. Part 560** |
| | : | **(Iranian Transaction Regulations)** |
| | : | |
| | : | **18 U.S.C. § 2** |
| | : | **(Aiding and Abetting)** |
| | : | |
| | : | **18 U.S.C. §1956(h)** |
| | : | **(Conspiracy to Launder Monetary** |
| | : | **Instruments)** |
| | : | |
| | : | **18 U.S.C. § 981(a)(1)(c)** |
| | : | **28 U.S.C. § 2461(c)** |
| | : | **(Criminal Forfeiture)** |

**INDICTMENT**

The Grand Jury charges that:

**COUNT ONE- CONSPIRACY**

At all times material to this Indictment:

INTRODUCTION

1.      Defendant ARASH SEPEHRI, also known as "William Anderson," (hereinafter "SEPEHRI"), was an Iranian citizen residing in the Republic of Iran.   Defendant SEPEHRI was the owner and managing director of defendant TAJHIZ SANAT SHAYAN, also known as Tajhiz Sanat Company, (hereinafter "TSS"), a company operating in Tehran, Iran. As part of his responsibilities, defendant SEPEHRI ordered U.S.-origin goods for Iranian customers.

2.      Defendant TSS was a company which arranged for the transshipment of goods through third countries to Iran on behalf of Iranian customers.   Defendant TSS has a listed address of No. 40, Yazdanpanah Street, Afriqa Blvd, Tehran, Iran.

3.      Known members of the conspiracy include, but are not limited to, the following individuals: (1) OMIDEREZA KHADEMI (hereinafter KHADEMI), a citizen of Iran, living in the United Arab Emirates (U.A.E.), who is businessman, and owner of OMID GNERAL TRADING LLC (hereinafter "OMID LLC"), a company based in the United Arab Emirates ("U.A.E."), and (2) an Iranian citizen who owns and operates Company B, another Iranian Supply Company ("conspirator B").   DEFENDANT TSS and Company B were listed by the European Union on May 23, 2011, as entities who were being sanctioned for their involved in the procurement of components for the Iranian nuclear program.   Defendant SEPEHRI was notified of these sanctions on or about May 25, 2011.

<u>The International Emergency Economic Powers Act and</u>
<u>the Iranian Transactions Regulations</u>

4.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the U.S. when the President declared a national emergency with respect to that threat.  Pursuant to the authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving goods from the United States.

5.      Beginning with Executive Order No. 12170, issued on November 14, 1979, the President has found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and declare[d] a national emergency to deal with that threat."

6.      On March 15, 1995, the President issued Executive Order No. 12957, which expanded and extended the national emergency regarding Iran announced in Executive Order 12170.  Executive Order 12957, which was expanded and continued by Executive Orders 12959 and 13059 (collectively, the "Executive Orders"), prohibited, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the U.S. or by a U.S. person.  The Executive Orders authorized the U.S. Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations ("ITR"), implementing the sanctions imposed by the Executive Orders.

7.      The ITR generally prohibit any person from exporting or causing to be exported

3

from the U.S. to Iran any goods or technology without having first obtained an export license from

the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located

in the District of Columbia.   The ITR imposed, among others, the following prohibitions:

Section 560.203 – Evasions; attempts

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

Section 560.204 – Prohibited exportations, reexportation, sale or supply of goods, technology or services to Iran:

Except as otherwise authorized [by a license issued by OFAC], the exportation, . . . sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, . . . sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

> (a) Such goods, technology, or services are intended specifically for supply, transshipment, or reexportation . . . directly or indirectly, to Iran or the Government of Iran . . .

Section 560.205 – Prohibited reexportation of goods, technology or services to Iran or the Government of Iran by persons other than United States persons;

Except as otherwise authorized pursuant to this part . . . the reexportation from a third country, directly or indirectly, by a person other than a United States person is prohibited if:

> (1) Undertaken with knowledge or reason to know that the reexportation is intended specifically for Iran or the Government of Iran; and

> (2)  The exportation of such goods, technology, or services from the United States to Iran was subject to export license application requirements under any United States regulations in effect on May 6, 1995, or thereafter is made subject to such requirements imposed independently of this part.

8.     The Iran Trade Embargo and the ITR were in effect at all times relevant to this

4

Indictment.

9.    At no time did the defendants SEPEHRI, TSS, and their other co-conspirators receive or possess a license or authorization from OFAC, located in the District of Columbia, to export goods, technology, or services, of any description, to Iran.

<u>The Export Administration Act of 1979</u>

10.    The Export Administration Act of 1979 ("EAA"), 50 U.S.C. §§ 4601-4620, authorized the President of the United States to control the export of certain "dual use" goods and technology without first obtaining a license from the Department of Commerce.   The Department of Commerce promulgated the Export Administration Regulations ("EAR") and maintains the Commerce Control List, which specifies the goods and technology that require export licenses. The Commerce Control List consists of general categories of items and technologies that are controlled for export and are so designated by an Export Control Classification Number (ECCN). The EAR and the Commerce Control List are codified at 15 C.F.R. parts §§ 730-774.   Items on Commerce Control List may require a license issued by the Bureau of Industry and Security ("BIS"), which is located at the Department of Commerce in the District of Columbia.   The EAA and EAR have been extended by annual Executive Orders issued by the President under IEEPA. <u>See</u> 75 Fed. Reg. 50681 (2010); 76 Fed. Reg. 50661 (2011); 77 Fed. Reg. 49699 (2012); 78 Fed. Reg. 49107 (2013); 79 Fed. Reg. 46959 (2014); 80 Fed. Reg. 48231 (2015).

11.    If required pursuant to the EAR, it is the responsibility of the exporter to obtain a required export license from BIS (or the Department of Commerce).    An export license may be required depending upon the technical description of the item itself, the destination country, the end user and/or the nature of the end use. Because the EAA and EAR have been extended under IEEPA, violations of the EAA and the EAR are punishable as violations of IEEPA.   OFAC also

administers a comprehensive embargo against Iran as codified in the ITR, and to avoid duplication, exporters and reexporters are not required to seek separate authorization from BIS an export or reexport that subject to the EAR and also prohibited pursuant to the ITR.   See 15 C.F.R. §746.7(a)(2).   If OFAC authorization is required for an export or reexport to Iran, and authorization is not obtained, a violation of the EAR has occurred.

12.   The Side Scan Sonar System, manufactured by a Massachusetts Company, was classified throughout all of 2011 as having an Export Control Classification Number ("ECCN") 6A991, which is controlled under the Commerce Control List for anti-terrorism purposes.   The BIS has confirmed that a BIS export license was required to export the Side Sonar System to Iran in 2011.

13.   At no time in 2010, 2011, or 2012, did defendants SEPEHRI, TSS, and their co-conspirators apply for, receive, or possess, or cause others to apply for, receive, or possess a license from BIS (or alternatively "the Department of Commerce"), or OFAC, which are located within the District of Columbia, to export to Iran or Hong Kong any parts, and accessories from the United States.

**THE CONSPIRACY**

14.   Beginning as early as on or about February 24, 2010, the exact date being unknown to the Grand Jury, and continuing through in or around November 2011, in the District of Columbia and elsewhere, defendants SEPEHRI and TSS did knowingly and willfully combine, conspire, confederate, and agree with each other and others, known and unknown to the Grand Jury, to (a) commit an offense against the United States, that is, to export and cause the exportation of goods from the United States to Iran in violation of the prohibitions imposed upon that country by the United States, without having first obtained the required licenses from OFAC, located in the

District of Columbia, in violation of Title 50, United States Code, Section 1705 (IEEPA), and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204 (ITR); and BIS, located in the District of Columbia, in violation of Title 50, United States Code, Appendix, Sections 2401-2420 (EAA), and Title 15, Code of Federal Regulations, Parts 730-774 (EAR); and (b) defraud the United States government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations relating to the export or supply of goods from the United States, by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

15.     The conduct alleged in this Count began outside of the jurisdiction of any particular State or district, and later occurred within the District of Columbia and elsewhere, and is therefore within the venue of the United States District Court for the District of Columbia pursuant to Title 18, United States Code, Sections 3237(a) and 3238.

OBJECTS OF THE CONSPIRACY

16.     The objects of the conspiracy were:

A.     to acquire U.S.-origin goods from the United States to supply to entities in Iran;

B.     to conceal from United States companies and the United States government that the U.S.-origin goods were destined for Iranian end-users so as to avoid penalties and disruption of the illegal activity;

C.     to make a financial profit for defendant SEPEHRI and his co-conspirators; and

D.     to evade the prohibitions and licensing requirements of EAA, EAR, IEEPA and ITR.

<u>MANNER AND MEANS OF THE CONSPIRACY</u>

17.     The manner and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

A.      Defendant SEPEHRI and other conspirators began planning and acting outside of the United States to acquire goods from inside the United States and elsewhere.

B.      Defendant SEPEHRI and other conspirators used e-mail accounts and other forms of electronic communication to communicate with one another and with other individuals located in the United States, Iran and elsewhere.

C.      Defendant SEPEHRI and other conspirators used companies outside of Iran to solicit purchase orders for U.S.-origin goods to companies located in the United States on behalf of other conspirators and customers in Iran.

D.      Defendant SEPEHRI and other conspirators used false names and companies to place orders and purchase U.S.-origin goods from companies located in the United States.

E.      Defendant SEPEHRI and other conspirators used companies outside of Iran, including OMID LLC, to transship goods from the United States through third countries, including Hong Kong, to Iran.

F.      Defendant SEPEHRI and other conspirators intentionally concealed from companies, shippers, and freight forwarders located in the United States the ultimate end-use and end-users of the purchased U.S.-origin goods.

G.      Defendant SEPEHRI and other conspirators caused the U.S.-origin goods to be exported from the United States to individuals and entities in Iran without obtaining a license from OFAC and BIS, which are located in the District of Columbia.

H.      Defendant SEPEHRI and other conspirators caused international monetary instruments to be sent from the U.A.E. and elsewhere, to the United States, to pay for the U.S.-origin goods which were being purchased for illegal export to Iran.

<u>OVERT ACTS</u>

18.     In furtherance of this conspiracy, and to accomplish its purposes and objects, at least one of the conspirators committed or caused to be committed, in the District of Columbia, and elsewhere, at least one of the following overt acts, among others:

<u>PCI Express Analog Input Board</u>

(1)   On or about February 24, 2010, conspirator KHADEMI gave defendant SEPEHRI the name of a company and its address in Hong Kong, hereinafter "Hong Kong Company," to use for the transshipment of goods to Iran.

(2)    Sometime in August 2010, conspirator KHADEMI had a conversation with conspirator B regarding conspirator KHADEMI reaching out to a French company in order to try to acquire a PCI Express Analog Input Board, breakout board and cables from a French company for defendant SEPEHRI and conspirator B.

(3)   On or about August 21, 2010, conspirator KHADEMI sent an email to defendant SEPEHRI, requesting more information about the use of the parts in order to speak to the French company, and on that same day, defendant SEPEHRI replied, "We have not informed the supplier that we are using them in Iran, just tell them it's for a research center in UAE for analyzing light spectrum, this is the best answer.  In iran [sic] these items will be used for Tehran University Computer lab."

(4)   On August 24, 2010, defendant SEPEHRI sent an email to conspirator KHADEMI, informing him that there was no need for him to contact the French company because they were switching to a different supplier.

(5)   On or about September 9, 2010, defendant SEPEHRI, using a false name, caused an Alabama company to ship a U.S.-origin PCI Express Analog Input Board, breakout board and cables to the Hong Kong company previously provided by conspirator KHADEMI.

(6)   On or about September 9, 2010, defendant SEPEHRI forwarded his email correspondence with the Alabama company to conspirator KHADEMI, stating "Another load is shipped to HK, please be informed."

(7)   On or about September 12, 2010, defendant SEPEHRI sent an email to conspirator KHADEMI, directing him to send the PCI Express Analog Input Board, breakout board and cables to defendant SEPEHRI's attention at Company B in Tehran, Iran.

(8)   On or about September 18, 2010, conspirator KHADEMI caused the Hong Kong Company to ship the PCI Express Analog Input Board, breakout board and cables from Hong Kong to defendant SEPEHRI in Iran.

<u>Rugged Laptop Computers</u>

(9)   On or about September 21, 2010, defendant SEPEHRI sent an email to conspirator KHADEMI, informing him, "for your information a shipment of 70,429$ which is 21pcs of laptop is ready in US for shipment and we want to ship it HK.   And we will not wait for any thing to mix with it and you can immediately ship to Iran."

(10)   On or about October 5, 2010, defendant SEPEHRI caused a California company to ship 21 U.S.-origin rugged laptop computers to the Hong Kong company previously provided by

conspirator KHADEMI, by causing a wire payment to be made from the U.A.E. to the California company in United States in the amount of $70,424.

(11)   On or about November 24, 2010, conspirator KHADEMI caused the 21 rugged laptop computers to be shipped from Hong Kong Company to defendant SEPEHRI and conspirator B in Iran.

Side Scan System

(12)   On or about February 15, 2011, defendant SEPEHRI, using a false name, contacted a Massachusetts-based company to purchase a U.S.-origin, Side Scan System and related equipment.   A side scan system was a small portable scan sonar system that was suitable for towing by small water craft and provided high resolution images, and has possible military application.   The Side Scan System is export controlled by the Department of Commerce, and export to Iran requires a license issued by the BIS.   The Massachusetts-based company referred defendant SEPEHRI to its distributor located in the U.A.E. (hereinafter "U.A.E. distributor").   On or about February 20, 2011, the U.A.E. distributor provided defendant SEPEHRI a price quote for a U.S.-origin Side Scan System and related equipment.

(13)   On or about June 7, 2011, defendant SEPEHRI caused $23,000 to be sent to the U.A.E. distributor as a down payment for the Side Scan System and related equipment. Defendant SEPEHRI indicated to the U.A.E. distributor that the U.S.-origin system was for use in Hong Kong.

(14)   On or about July 2011, defendant SEPEHRI caused the Massachusetts-based company to ship the Side Scan System and related equipment to its U.A.E. distributor for ultimate delivery to defendant SEPEHRI in Hong Kong.

(15)   On or about August 18, 2011, defendant SEPEHRI caused $20,000 in cash, and approximately $5,900 to be provided to the U.A.E. distributor for full payment for the Side Scan System. On or about October 19, 2011, the U.A.E. distributor wired over $72,000 from a bank in the U.A.E. to the Massachusetts-based company through a bank located in the United States as payment for Side Scan Systems sold to defendant SEPEHRI and other persons.

(16)   On or about August 29, 2011, defendant SEPEHRI caused the U.A.E. distributor to send the Side Scan System and related equipment to the Hong Kong Company.

(17)   On or about August 29, 2011, defendant SEPEHRI sent an email to conspirator KHADEMI, stating "Please find attached file as a shipment which us being shipped to HK."   The attached file consisted of a commercial invoice and a packing slip for a Side Scan System and related equipment from the U.A.E. distributor.   Each indicated "Country of Origin: USA."

(18)   Sometime after August 29, 2011, conspirator KHADEMI caused the Side Scan System to be shipped from Hong Kong to defendant SEPEHRI in Tehran, Iran, at the address of Company B.

## Underwater Acoustic Transducer

(19)   On or about September 8, 2011, defendant SEPEHRI, using a false name, caused an Ohio company to ship a U.S.-origin underwater acoustic transducer to the Hong Kong company previously provided by conspirator KHADEMI and caused a wire payment to be made from the U.A.E. to the United States in the amount of approximately $2,447.   The transducer was designed for military and scientific applications in an underwater environment.   On that same day, defendant SEPEHRI forwarded his email correspondence with the Ohio company to conspirator KHADEMI, stating "Attached item is also sent to HK by UPS, please ask them to mix with the previous one and ship together to iran[sic]," and sending the UPS tracking number.

(20)   On or about September 11, 2011, conspirator KHADEMI responded to defendant SEPEHRI, stating that the shipments could not be joined, and requesting the invoice and consignee details for the underwater acoustic transducer.   On that same day, defendant SEPEHRI responded, giving conspirator KHADEMI the Tehran Iran address of Company B.

(21)   Some time after September 14, 2011, conspirator KHADEMI caused the transducer to be shipped from Hong Kong to defendant SEPEHRI in Iran.

(22) At no time did defendants SEPEHRI, TSS or any of its coconspirators apply for a license from OFAC or the BIS to export any items from the United States to Iran.

(**Conspiracy to Unlawfully Export U.S. Goods to Iran and to Defraud the United States and the U.S. Department of the Treasury**, in violation of Title 18, United States Code, Section 371)

## COUNTS TWO AND THREE-

## EXPORTS TO EMBARGOED COUNTRY

19.   The allegations in Paragraphs 1 through 13 and 16 through 18 are incorporated and re-alleged by reference in this Count.

20.   On or about the dates listed as to each count below, in the District of Columbia, and elsewhere, the defendants SEPEHRI and TSS did knowingly and willfully violate the embargo against Iran by attempting to cause and causing to be exported and reexported from the U.S. various products, as described more fully in Counts 2 through 3, from the U.S. to Iran via Hong Kong, without first having obtained the required authorizations from the U.S. Department of the Treasury's Office of Foreign Assets Control, located in the District of Columbia:

| COUNT | DATE | ITEM DESCRIPTION | DESTINATION |
|:---:|:---:|:---|:---:|
| 2 | July 20, 2011 | Side Scan System | Iran |
| 3 | September 8, 2011 | Underwater Acoustic Transducer | Iran |

(**Unlawful Exports of U.S.-Origin Goods to Iran**, in violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.205; **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Section 2)

## COUNT FOUR-

### ATTEMPTED UNLAWFUL EXPORTS OF DEFENSE ARTICLES FROM THE UNITED STATES

21.   The allegations in Paragraphs 1 through 13 of this Indictment are incorporated and re-alleged by reference herein.

The Arms Export Control Act

22.   The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorized the President of the United States to control the export of "defense articles" by designating items on the United States Munitions List ("Munitions List"), which is codified at 22 C.F.R. Part 121.

23.    The AECA and its attendant regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130, require a person to apply for and obtain an export license from the United States Department of State, Directorate of Defense Trade Controls ("DDTC"), located in the District of Columbia, before exporting from the United States arms, ammunition, or articles of war which are categorized as defense articles under 22 U.S.C. §§ 2778(b)(2) and 2794(3), and 22 C.F.R. Parts 120.1 and 121.1.   In the application for an export

license, the exporter is required to state, among other things, the nature of the defense articles to be exported, the end recipient of the defense articles, and the purpose for which the defense articles were intended. Under AECA it is a crime to export, attempt to export, or conspire to export, a defense article without a license.   22 C.F.R. § 127.1.

24.   The defense articles which are subject to such licensing requirements are designated on the United States Munitions List ("Munitions List").   Those designations are made by the State Department with the concurrence of the Defense Department under 22 U.S.C. § 2778(a)(1) and 22 C.F.R. Part 120.2.   Since at least 1991, the U.S. government has maintained an arms embargo against Iran that prohibits the export, re-export, or re-transfer of any defense articles to Iran.   It is the policy of the United States and the U.S. Department of State to deny license applications and any other written requests or approvals for the export, re export, or transfer to the Iran of defense articles on the Munitions List.

25.   Category XII(e) of the Munitions List includes a 450mm F/3 3.7-10 micron Catadioptric Lens Assembly, Part Number SR 0847-A01, which is produced by a New Hampshire based company, as this item is a lens for a missile tracking device. As such, a license issued by DDTC is required prior to any export from the United States.

26.   The AECA and ITAR were in effect at all times relevant to this Indictment.

27.   Between February 2011 and November 2011, beginning outside of the jurisdiction of any particular State or district, and later within the District of Columbia and elsewhere, defendants SEPEHRI and TSS and other confederates did knowingly and willfully attempt to export, and cause to be exported, part number SR0847-A01, a lens assembly manufactured by a company based in New Hampshire, which is defense article and item on the Munitions List, from the United States to Iran, without having first obtained the required license from the DDTC, located in the

District of Columbia.

28,  At no time in 2010, 2011, or 2012 did defendants SEPEHRI, TSS, and their co-conspirators apply for, receive, or possess, or cause others to apply for, receive, or possess a license from the DDTC, located within the District of Columbia, to export to Iran or Hong Kong any parts, and accessories from the United States.  Defendants SEPEHRI, TSS, and their co-conspirators also have never   registered with DDTC as defense article exporters or brokers.

(**Unlawful Export of Defense Articles from the United States**, in violation of Title 22, United States Code, Section 2778; Title 22, Code of Federal Regulations, Parts 120-130; **Aiding and Abetting and Causing an Act to be Done**, in violation of Title 18, United States Code, Section 2)

## COUNT FIVE-

## CONSPIRACY TO LAUNDER MONETARY INSTRUMENTS

29. The allegations in Paragraphs 1 through 20 of this Indictment are incorporated and re-alleged by reference herein.

30.  Beginning at least in or about February 2010 and continuing through in or about November 2011, defendants SEPEHRI and TSS, and co-conspirators known and unknown to the Grand Jury, willfully combined, conspired, confederated, and agreed with each other and with others known and unknown to the Grand Jury, within the District of Columbia and elsewhere, to violate Title 18, United States Code, Section 1956(a)(2)(A), that is, by transporting, transmitting, and transferring, or attempting to transport, transmit, and transfer monetary instruments and funds from places outside of the United States, that is the U.A.E. and elsewhere, to AND through a place inside the United States, with the intent to promote the carrying on of specified unlawful activity, that is, violations of IEEPA, ITR, EAA, and EAR, and smuggling and other U.S. export control violations, all in violation of Title 18, United States Code, Sections 1956(h).

(**Conspiracy to Launder Monetary Instruments**, in violation of Title 18, United States Code, Section 1956(h))

## FORFEITURE ALLEGATION

1.        Upon conviction of any offense alleged in Counts One through Four of this Indictment, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes, or is derived from, proceeds traceable to a violation of the offenses.  The United States will also seek a forfeiture money judgment against the defendants for a sum equal to $125,661.

2.        Upon conviction of an offense alleged in Counts One and Four, the defendants shall forfeit to the United States any arms and munitions of war and other articles exported and shipped from, attempted to be exported and shipped from, and taken out of the United States in violation of law as the result of the offenses alleged in Counts One and Four, and any vessel, vehicle, or aircraft containing the same or which has been or is being used in exporting or attempting to export such arms or munitions of war or other articles as the result of the offenses alleged in Counts One and Four, pursuant to 22 U.S.C. § 401(a) and 28 U.S.C. § 2461(c).

3.        Upon conviction of the offense alleged in Count Five, the defendants shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1).  The United States will also seek a forfeiture money judgment against the defendants for a sum of money equal to the value of any property, real or personal, involved in the violation and any property traceable to such property.

4.        If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property that cannot be subdivided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

(**Criminal Forfeiture**, in violation of Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), Title 28, United States Code, Section 2461(c), and Title 22, United States Code, Section 401(a)).

A TRUE BILL

FOREPERSON

Attorney of the United States in
and for the District of Columbia